# CHARLESTON.

## VAN WINKLE v. BLACKFORD.

Submitted June 6, 1903—Decided February 9, 1904.

54    621
65    759
65    762

1.  PERSONAL REPRESENTATIVE.

    A personal representative who, within six months after the end of any one year of his service as such, has fully explained to the parties entitled to the money received in such year, verbally and by informal written statements, the amount so received together with the sources from which it came, and the amount disbursed, including charges of administration, and has actually paid to such parties all they are entitled to receive on account of such money, is entitled to compensation for his services for such year, in respect to the interest so settled for and paid. (p. 638).

2.  GUARDIAN AND WARD.

    When the parties entitled are infants, and the personal representative has neither given their guardian a complete statement in writing, nor paid the money over to the guardian, within the time aforesaid, but has only given information verbally and by informal memoranda to the guardian, concerning the receipts for the year, he is not entitled to commission on the shares of the infants. (p. 640).

3.  ADMINISTRATOR.

    An administrator of a surety having in his hands, as such administrator, bank stock certificates, when the principal debtor becomes insolvent, may, and should, apply, on the debt for which the decedent is bound as surety, the value of the stock and any dividends thereon remaining in his hands. (p. 642).

4.  DECEASED PERSON—*Stocks.*

    That stock stands on the transfer book of a corporation in the name of the deceased person, is not conclusive evidence that it belongs to his estate. As it is equally consistent with his having held the stock as collateral, circumstances clearly indicating that it was so held are sufficient to support a finding to that effect by a commissioner, especially when it is shown that the deceased person kept a careful book account of his investments which does not disclose an investment in such stock. (p. 644).

5.  CREDITOR—*Insolvent Person.*

    A creditor of an insolvent person, after having applied, on the debt due him, the value of securities in his hands, can prove

only the balance due him against the estate of the insolvent. (p. 647).

6. BONDS—*Public Officer—Presumption.*

When it is shown by public records that an official bond has been given by a public officer, but search for it is unavailing, the presumption in favor of the regularity of the acts of public officers applies, and the court may assume that the condition of the bond was such as the law required. (p. 651).

7. ADMINISTRATOR—*Liability.*

*Prima facie* an administrator is liable for the whole amount of the estate of his decedent and must account for the same, but, as to any assets of the estate he may so account by showing that the same are worthless or have been lost, without any fault or negligence on his part, or failure on his part to use due diligence to prevent the loss, and his oath is *prima facie* proof of such worthlessness or loss. (p. 653).

8. ADMINISTRATOR—*Bonds—Liability.*

A testator whose personal estate amounted to less than $60,-000.00, of which $40,000.00 was represented by equal amounts of the interest bearing bonds of two railroad companies, and the balance for the most part, by other bonds and notes, direct-ed, by his will, that two funds of $5,000.00 each be invested "in some safe public bonds or securities, bearing at least six per centum annual interest" or deposited "with some trust company at the time reported solvent," and the interest thereon paid to his two sisters during their natural lives, and, after their deaths, the principal sums to be put into the residuum of his personal estate. He died in 1872, and the administrator with the will annexed, by way of compliance, set apart $5,000.00 of each of the two classes of railroad bonds, believing them to be good, and, in the panic of the year 1873, the bonds representing one of the funds greatly depreciated and were afterwards sold for forty-eight cents on the dollar. *Held*: That, under the circumstances stated in the opinion here filed, the administrator is not chargeable with the loss, nor, on account thereof, with compound interest in his settlement. (p. 654).

9. PERSONAL REPRESENTATIVE.

When a personal representative is in no sense at fault, and yet a balance for *any* year appears against him, the interest on such balance is not carried into the account for subsequent years, but stands over until final settlement or until sufficient disbursements have been made to discharge it, after having extinguished the balance of principal due. (p. 655).

10. PERSONAL REPRESENTATIVE—*Liability.*

    But when the debts have been paid, or there has been time in which to pay them, and the personal representative has only legacies and distributive shares to deal with, he is treated and settled with, as to interest, on the principles governing settlements between ordinary creditors and debtors, except that, under peculiar circumstances, he may become chargeable with compound interest. (p. 655).

11. PERSONAL REPRESENTATIVE.

    When there is a balance due the personal representative for any year, the interest thereon is carried into the account for subsequent years, except when by so doing, he would be allowed interest on interest. (p. 656).

Appeal from Circuit Court, Wood County.

Bill by W. W. Van Winkle against G. L. Blackford and others. Decree for plaintiff and defendants appeal.

*Reversed.*

CAMDEN & PETERKIN, for appellants.

VAN WINKLE & AMBLER and W. N. MILLER, for appellee.

POFFENBARGER, PRESIDENT:

This is a suit in equity, brought by W. W. Van Winkle, to surcharge and falsify a statement made by him as an administrator with the will annexed of Peter G. Van Winkle, in which capacity he acted from the 13th day of May, 1872, until the 24th day of April, 1883, when, upon his own motion, his powers, as such administrator, were revoked. Godwin L Blackford was afterwards appointed administrator *de bonis non,* with the will annexed. One of the items in controversy here, formed, in part, the subject matter of an action at law brought by W. W. Van Winkle against Blackford, administrator, in 1884, which came to this Court on a writ of error and is reported in 28 W. Va. 670. It was also the principal matter of controversy in the chancery suit instituted in 1889 by W. W. Van Winkle against Godwin L. Blackford, administrator, which also came to this Court on appeal and is reported in 33 W. Va. 573. It will be seen there that the cause was remanded with leave to the plaintiff to amend his bill by making new parties thereto, and to ask for a settlement of his whole administration account. Syllabus 6. At June

Rules, 1890, the amended bill was filed and prosecuted to a final decree, which was pronounced on the 9th day of January, 1901, and from which this appeal has been taken by M. C. Van Winkle, H. C. Van Winkle, Juliette G. Van Winkle and Justice E. Morrison.

It appears from the bill and proceedings that P. G. Van Winkle had a large estate. He bequeathed $5,000 in trust for Anna Maria Van Winkle during her natural life, and $5,000 in trust for Margaret Elizabeth Van Winkle during her natural life, they to receive the income and profits therefrom; and, at their deaths, respectively, said two sums were directed to be distributed with the residuum of the estate. He gave $2,000 to W. W. Van Winkle to be paid in installments if he should not have reached the age of twenty-five years at the death of the testator, and if he should have attained that age at that time, he was to receive the whole of the $2,000. He released his brother, Adolphus W. Van Winkle, from the payment of any indebtedness that might be due from him to the testator at the time of the death of the latter. He bequeathed to the wives of his sons, Rathbone, and Godwin Van Winkle, and the husband of his daughter, J. G. Blackford, $1,000 each, if living at the time of his death, all of whom were living at that time. The residue of his personal property, exclusive of notes, bonds, stocks, debts due him and money on hand, he gave to the survivors of his three children, Rathbone, Godwin and Mary, wife of J. G. Blackford, and the children of such of them as might die before the testator, *per stirpes.* All his real estate he devised to his said sons and daughter, in three equal undivided portions, the same to be partitioned as soon as practical after his death, and his two sons to take one equal third part of his estate each and hold the same in fee simple, while his daughter was to have the remaining one-third with power to take the rents and profits to her own separate use during her natural life, remainder in fee to her children and their heirs, but with power and authority in the executor, upon her request and his approval, to make sale of any of the real estate which might be allotted to her, and to invest the proceeds and hold the same in trust, and pay over the interest and profits thereof to his daughter during her natural life, and, at her death, divide and distribute the fund among her children and their heirs; or the executor, should he deem it most expe-

dient, was authorized to sell said share and divide and distribute the proceeds thereof as aforesaid, or, at the request of his daughter and, upon his approval, invest the proceeds in other real estate to be held by her during her natural life and remainder in fee to her children and their heirs. She was also authorized, with the approbation of the executor, or, in the event of his disease, of her brother Godwin, to lease, or rent, the land for the term of her natural life, etc. Of all the rest and residue of his property and estate, he gave to his sons, Rathbone and Godwin, two-thirds to be equally divided between them and their respective heirs absolutely, and the remaining one-third to them or the survivor of them to be held in trust and to pay the interest and profits to his daughter during her natural life and, after her death, to pay to each of the children of his daughter, who might then be twenty-five years of age one equal share therein, and, to such as might be under the age of twenty-one years, so much of the interest and profits on their respective shares as might be necessary to their maintenance and education while under the age of twenty-one years, reinvesting any surplus that might remain, and paying to them the whole amount of the interest upon their shares while between the ages of twenty-one and twenty-five, and, at the age of twenty-five, their respective shares with all accumulations thereon.

Rathbone Van Winkle, died in 1870, prior to the death of his father, leaving surviving him his widow, Sarah Van Winkle, and four children, M. C. Van Winkle, H. C. Van Winkle, Juliette Van Winkle and Harriette G. Van Winkle, all of whom were under the age of twenty-one years at the time of the death of the testator. The plaintiff here qualified as the administrator of Rathbone Van Winkle, in which capacity he acted until 1877, when he resigned and was succeeded by M. C. Van Winkle. On or about the first day of June, 1873, Anna Maria Van Winkle died, and about September, 1883, Godwin Van Winkle, died without issue, leaving surviving him his widow, Sarah E. Van Winkle, and Joseph B. Neale qualified as his administrator. J. G. Blackford died about September, 1884, and A. W. Van Winkle, another of the legatees, in April, 1875.

As already stated, the executor named in the will having died before the testator, W. W. Van Winkle was appointed administrator with the will annexed, and entered upon the execution of the trust and paid and set apart, as directed by

the will, all the specific legacies. About this, there seems to be no controversy. He alleges in his bill that, during the first year of his administration he divided between, and paid to, each of the other legatees, so far as the same came into his hands to be administered during that year, all the rest and residue of the property and estate to which the testator was entitled. But this is denied by the joint and separate answer of the appellants and Sarah Van Winkle and the answer of Mary V. Blackford and others. However, it clearly appears that the great bulk of the estate was paid over during the year.

Presumably no settlement, such as the statute requires to be made before a commissioner and recorded, was ever made by the administrator, nor any inventory filed. On the 5th day of April, 1883, Mary V. Blackford caused a notice to be served on him to the effect that, on the 23rd day of that month, she would move the county court of Wood county to require him to execute a new bond and, if he refused to give it, she would move the court to revoke his powers as administrator and appoint another in his stead. On the return day of the notice he appeared and moved the court to revoke his powers, refusing to give a new bond. This was done, but he was required to settle his acounts before O. M. Clemens, who was appointed a special commissioner of said court for that purpose. Afterwards, he made up a statement of his account and presented it to the commissioner and it was approved by him and returned to the county court with exceptions taken by Mary V. Blackford. It showed that there was due the administrator upon his administration of the personal estate $2,858.41, and upon transactions in reference to the real estate, $2,520.45, total $5,378.86. The court sustained the exceptions and the acount was recommitted to K. S. Snodgrass, commissioner, to be reconsidered and restated. Commissioner Snodgrass's final report was made November 23d, showing an indebtedness of the administrator to the estate in the sum of $4,118.86, as of May 13, 1883, on account of the personal property and estate of the testator. His report further showed that there was due the administrator the sum of $2,342.31, as of the same date, for moneys expended by him, on account of the real estate over and above what came into his hands from that source. This report was confirmed by the county court in November, 1886, and was

never disturbed in any manner until the amended bill in this suit was filed. In the mean time, however, the two suits hereinbefore referred to as having been disposed of in this Court, had been brought and prosecuted.

The object of the amended bill is to obtain credit for several items which Commissioner Snodgrass of the county court refused to allow in ·the settlement. One of these is a claim for commission on the accounts settled with, and paid to, Anna M. and Margaret E. Van Winkle. Another was a claim for $266.10 for commission charged for ten years' attention to, and management of, the real estate. Another was for $850 paid to the treasurer of the sinking fund of the city of Parkersburg, the principal item of contention in said two former suits. Another is a claim of $2,315.77, commissions, as administrator, on receipts for the first and second years of the administration. The bill also seeks relief from an alleged erroneous charge of $2,152.15, on account of certain shares of bank stock which stood on the transfer book of the bank in the name of P. G. Van Winkle and were transferred·by W. W. Van Winkle, administrator, to himself individually, he claiming to have been the rightful holder of them as collateral security to indemnify him as endorser on a note made by J. B. Blackford, the original owner of the stock, who had, before that time, transferred it to P. G. Van Winkle to indemnify him as endorser upon another and older note, and subsequently the absolute owner by purchase and agreement with Blackford. It is contended by the appellants that the note upon which P. G. Van Winkle was endorser, and to the payment of which said stock was pledged, was paid out of the estate of the testator, and that it was the duty of the administrator to apply the stock on said note or account to the estate for the value of it. There are two other small items, $125.71, $121.69, respectively, which it is claimed, were disallowed, but the appellants insist that they were allowed. The controversy over them arises from the different methods adopted by Commissioners Clemens and Snodgrass in stating the account.

The answer filed by the appellants not only resists all these attacks upon the settlement made in the county court, but goes beyond that and sets up several matters with which it is claimed that the administrator should have been charged but was not.

One of these is in respect to dividends collected by him upon said bank stock, amounting to several hundred dollars. Another is in reference to certain bonds of the Little Kanawha Navigation Company which, it is claimed, were delivered by J. G. Blackford to the testator as collateral to indemnify him against loss as endorser upon a note made by said Blackford. Another is in reference to a loan of something over $8,000 made by the plaintiff, as administrator of Rathbone Van Winkle, to Godwin Van Winkle, who subsequently went into bankruptcy in the State of Texas, in return for which the appellants received only certain real estate and personal property which they say was not worth anything like the debt.

On motion of the plaintiff, and over the objection of the defendants the court, on August 24, 1893, entered a decree, referring the cause to J. W. Vandervort, commissioner, to settle the accounts of the complainant, late administrator with the will annexed of P. G. Van Winkle, deceased, and to regard the settlement made by him before commissioner Snodgrass as *prima facie* correct, subject to be surcharged and falsified by the plaintiff or the defendants or any of them. The plaintiff was also required in that decree to return and file before the commissioner an inventory of all the assets which came into his possession or knowledge and also all papers, vouchers and books in his possession, relating to any of the items in said settlement so far as they are surcharged and falsified in the bill, answer or specifications filed by any of the parties. Commissioner Vandervort filed his report August 16, 1897, and returned therewith all the depositions and the evidence taken by, and filed with, him. He reported against all the claims made by the plaintiff and gave it as his opinion that the account, as stated by Commissioner Snodgrass, was correct and should stand, as to the amount, $4,118.86, with interest from May 13, 1883, found to be due from the administrator to the estate. He reported that there is due to the administrator the sum of $2,342.52, with interest from May 13, 1883, on account of his transactions relating to the real estate, but gave it as his opinion that said real estate account was not proper to be considered in the settlement, and submitted it to the court whether any deduction should be made on account thereof from the amount due from the administrator on account of the

personal property. As to the attacks made upon the settlement by the defendants, the commissioner reported that, not having sustained any of the allegations of error made by the plaintiff, he did not deem it necessary, under the pleadings, to consider the allegations of error made by the defendants, it being his understanding from the answers that the defendants did not wish to disturb the settlement, unless surcharged and falsified in respect to some of the claims made by the plaintiff. Before the report was filed, the plaintiff filed five exceptions thereto with the commissioner. The first was on the ground that the report failed to show that the administrator had compromised with Mary V. Blackford while the suit was pending. The second was based on the absence of the commissioner's notice, which he certifies, in passing upon the exception, had become lost but gives the date of its issue and return. The third was based upon the failure of the commissioner to notify Margaret E. Van Winkle, who had never appeared in the cause. The fourth was based upon the refusal of the commissioner to allow plaintiff his commissions and credit for the $850 hereinbefore mentioned. The fifth seems to have been general, going to the whole report. All of them were overruled by the commissioner.

On January 9, 1901, a stipulation, signed by counsel for all the parties, was filed, wherein it was recited that the court was of opinion that, before final decree, the cause should be recommitted to the commissioner, and agreed by the parties that such recommittal was thereby waived, and that all matters arising upon such accounts and surcharges and falsifications thereof and upon all matters presented by the papers, proceedings and evidence were referred to the court for final determination and adjudication, "the finding of the court to have the same effect as upon a report of a commissioner regularly made up and filed in the cause." The final clause of the stipulation reads as follows: "And this cause is submitted to the court in accordance with this agreement and stipulation upon the pleadings and proofs and evidence taken and filed as aforesaid in said cause." On the same day a decree was entered whereby it was adjudged, ordered and decreed "that sub-exception 'b' of the fourth exception of complainant to said report of Commissioner Vandervort for disallowing the complainant commissions ($266.10) on the real

estate account, and sub-exception 'c' of said fourth exception for disallowing the exceptor credit for $850 paid April 11, 1891, (1881) to W. N. Chancellor, treasurer etc.," were well taken and therefore sustained; and "that sub-exception 'd' of said fourth exception, to the extent of $2,315.77, the amount of the commissions on the receipts and disbursements for the first year * * * * is well taken, the court finding as a fact that within six months after the end of the first year of the administration of said estate by complainant, the said complainant, as such administrator with the will annexed of Peter G. Van Winkle, gave to the parties entitled to the money received in said year a statement of said money and actually settled thereafter with them."

Having made these alterations in the settlement, the decree ascertained and adjudged that there was due from the administrator $953.09, as of May 13, 1883, on account of personal estate, and allowed the administrator credit for $266.10 commission and his account of $2,608.61, growing out of his transactions in reference to the real estate and found, by deducting from the amount due to the administrator the sum due from him to the estate, that there was a balance due to him of $1,655.52, as of May 13, 1883, with interest from said date, making a total of $3,409.54, and decreed said sum to be paid by Godwin L. Blackford, administrator *de bonis non* with the will annexed out of the goods and chattels remaining in his hands to be administered. But the court refused to decree over against the distributees of the estate for said sum on account of the staleness of the demand.

On the theory that the bill could not be amended in the manner in which it was, the defendants demurred to it, but the court overruled the demurrer. It is argued that this amendment amounts to a departure in pleading, making a new cause of action, different from that set out in the original bill. If that were true, the demurrer should have been sustained. But this Court held the original bill to be, in substance and effect, a bill to surcharge and falsify the administrator's settlement, but defective and insufficient for want of parties only. *Van Winkle v. Blackford,* 33 W. Va. 573, 588. It sought correction of the settlement in respect to only one or two items, but its object was to surcharge and falsify the settlement in respect to them. That fixes the nature of the bill. Its character, as thus fixed and determined, is not changed by the addition of attacks upon the

settlement relating to other items, nor the making of new neces-
sary parties to it.  It is a familiar principle of equity that, after
sufficient steps have been taken with respect to one or more items
in an *ex parte* settlement, or stated account, to surcharge and
falsify it in respect thereto, all parties to the bill may, by mere
informal specifications, attack the settlement as to other items
without limit.  In view of this it is not perceived that this bill is,
in any respect or degree, a departure such as is claimed.  How-
ever, the Court having remanded the cause to the circuit court
with an express adjudication of the right of the plaintiff to so
amend his bill and to proceed as he has done, is not the ques-
tion *res judicata? Van Winkle v. Blackford,* 33 W. Va. 573.

By the decree complained of the settlement was altered to the
extent of giving the plaintiff credit, and charging the estate,
with the sum of $850, paid by him, July 18, 1881, to W. N.
Chancellor, Treasurer of the Sinking Fund of the City of Park-
ersburg. . Unquestionably, said sum was paid by the plaintiff
within ten years from the time at which the testator, by reason
of his death, ceased to be such treasurer.  Nor is it denied that
said sum went into his hands and was never, by him, paid over
to the trustees of that fund.  It is contended that, at the time
of his death, he held it, not as treasurer, but as borrower.
Against this contention, however, stands the decision of this
Court in the case of *Van Winkle v. Blackford,* 28 W. Va. 670,
holding that the note, which it was claimed was given by the
testator, was void for want of delivery.  But whether that de-
cision is sufficiently pleaded here to bar this defense, is an in-
teresting question.  No reference is made to it in the original
bill.  On the first appeal, this Court, in its opinion, however,
fully and specifically stated the decision of this very point of
nullity of the note for want of delivery, in 28 W. Va., and re-
ferred to the opinion in that case.  The amended bill in this case
contains the following:

"Your orator further avers that he has been wrongfully and
unjustly deprived of the credit of $850.00, paid to W. N. Chan-
cellor, treasurer of the sinking fund, on the 18th day of July,
1881, which was allowed in the account of said Clemens, and
as to which your orator respectfully refers the court to the
opinion and direction of the Supreme Court of Appeals of West
Virginia, reversing the decree of this court in this case on the

original bill, and holding, as to the said item of $850.00, that said Snodgrass refused credit to your orator within his said account, that 'this payment was made on the 18th day of July, 1881, when the right of action on·the deceased treasurer's bond had still ten months to run before the barring of the statute could constitute a valid defense, and where a debt is not already barred the administrator may pay it if confessedly just and due without waiting to be sued, and ordinarily when he has funds of his testator·it is his duty to do so, and credit himself with such payments in his settlement.' Your orator charges that the said debt upon which said $850.00 was paid was not *paid* at the time of such payment on the 18th day of July, 1881; that it was confessedly a just debt, and then due, and that in the performance of your orator's duty as administrator, he paid such debt, and the same should have been credited to him by said Snodgrass in his said account, and that it should now be admitted as and credited to the account so made by said Snodgrass, revised and corrected in that particular according to the opinion and judgment of the said Supreme Court of Appeals."

Can this be treated as making the opinion of this Court in 33 W. Va. 573, part of the amended bill? If so, does it thereby set up the decision in accordance with the opinion in 28 W. Va. 670? That was evidently the intention, and it seems to have been so understood by the defendants, for, in their joint and separate answer, they say "and they allege that the decision of the Supreme Court, based on false facts, is not binding on these respondents who were not parties to said suit."

Proceeding upon the theory that they are not bound by the decision, because not parties to the suit, they offer evidence of the delivery of the note. If the decision is sufficiently pleaded here, they are undoubtedly bound by it. Nothing is involved here but the personal estate, and any decision, for or against the administrator, in the absence of fraud or collusion, is, as to it, binding upon the legatees and distributees. *Hooper* v. *Hooper,* 32 W. Va. 526, 534; *Corrothers* v. *Sargent,* 20 W. Va. 351; *Castellaw* v. *Guilmartin,* 54 Ga. 299; *Carey* v. *Roosevelt,* 83 Fed. Rep. 242; Black Judg. sections 560, 561; Big. Estop. 148.

Whether it is sufficiently brought into this record need not be decided. The evidence relied upon to prove delivery of the note is of the same kind as, and less in amount, if any differ-

ence, than that found in the record upon which the decision reported in 28 W. Va. 670, is based, and, though not bound to find the same way on it now, the Court ought to do so, unless the finding is clearly wrong. That decision is a precedent, having at least persuasive influnence. Moreover, that decision gave the administrator complete acquittal of liability on one ground, and to find the other way now would acquit him of another demand for the same money, predicated upon the very ground of action disclosed to him by said former decision. It would make two decisions of the same question by the same court directly conflict, as well as defeat the ends of justice. At the time that finding was made in favor of the Van Winkle estate, the bench of this Court was occupied by a body of jurists as able and eminent as any of their predecessors or successors, JUDGES GREEN, SNYDER, JOHNSON and WOODS.

The only remaining contention about it is that there is no proof that any bond was ever given by the testator as such treasurer, and that, if one was given, its contents are not shown. It appears from copies of the minutes kept by the trustees of the sinking fund that P. G. Van Winkle was designated by the board as their treasurer and that he, with his sureties, James Cook and W. L. Jackson, entered into a bond in the penalty of $10,000 conditioned as required by the ordinance, and that afterwards, owing to a defect in the form of that bond, a new one was given with William Logan and Beverly Smith as sureties. What that condition was, the record fails to disclose, and it is shown by the custodian of the papers and records of the city of Parkersburg, that diligent search by him for the bond among the records has failed to reveal it. The minutes show that it was given in October, 1895. From these facts, the only reasonable inference is that the bond was given and has been lost, and that, as it was given by the testator as treasurer of a large fund, it was conditioned for the faithful performance of his duties. The maximum *omnia praesumuntur rite esse acta, donec probetur in contrarium*—all things are presumed to be rightly done until the contrary is proven—applies here. This was a bond given by a public officer, the condition of which is prescribed by the law, namely, that it shall be for a faithful discharge by him of the duties of his office, and for acounting for and paying over, as required by law, all money which may

come to his hands by virtue of the said office. Code, chapter 10, section 6. It having been shown that the bond was given and has been lost, secondary proof of its contents is admissible. Of what such proof may consist is shown by the case of *Leland* v. *Cameron* 31 N. Y. (4 Tiff.) 115. There, an execution had been issued and lost. The attorney who issued it and the sheriff into whose hands it went were both dead, and the only evidence was an entry by the attorney in his register of the issuing of the execution. In the head notes the court say, "The contents of the execution in such case may be inferred from the facts, that the law prescribes its form; the attorney issuing it was conversant with such instruments, and the sheriff to whom it was directed knew what it must contain to authorize him to sell the property. In view of such facts, and after a lapse of thirty years, the court may assume that the execution was in due form, containing all such directions as the statute required it should contain." In 22 Am. & Eng. Enc. Law, (2d Ed)., 1274, it is said: "The presumption of the regularity of official acts applies, as a general rule, to all kinds of official acts." In vew of these authorities, the objection of want of proof of the bond and its contents clearly fails. It being clearly shown that, as treasurer, he failed to pay over said sum of money, there was a breach of the condition of the bond, for which a right of action existed against his administrator which was not barred at the time he made the payment. That is sufficient to entitle him to credit. Counsel for appellee claim the right to credit for this amount is *res judicata,* by the decision in *Van Winkle* v. *Blackford,* 33 W. Va., 587, but that cannot be. The sufficiency of the bill was the only question before the Court then. It is now a question of proof of its allegations.

The next item, in logical order, is the allowance by the decree to the plaintiff of $2,315.77, his commissions on receipts and disbursements for the first year of his administration, to which extent the decree altered the settlement. This claim was disallowed by Commissioner Snodgrass and the county court and by Commissioner Vandervort, for the reason that the plaintiff had failed to make a settlement of his account before a commissioner within six months after the expiration of one year from the date of his qualification as administrator. It was also held,

by these commissioners, that the plaintiff had failed in his effort to show that, within that time, he had given to the parties entitled to the money received in such year, a statement thereof and actually settled therefor with them, and thus relieved himself from the forfeiture of his commissions as it is provided in section seven of chapter eighty-seven of the Code, he may do. Upon all the evidence in the case brought up and made a part of the record by agreement of the parties, the court set aside this finding of the commissioner and found as a fact that, within six months after the end of the first year, the administrator gave to the parties a statement and actually settled with them. This is a finding of fact by the court, and, while not conclusive, this Court will not reverse the finding unless it is decidedly against the weight of evidence. *Weaver* v. *Akin*, 48 W. Va. 456; *Kennewig Co.* v. *Moore,* 49 W. Va. 323; *Chilhowie Lumber Co.* v. *Lance,* 52 W. Va. 636.

But, to ascertain whether it is against the weight of evidence, it is necessary to see what the evidence is, and whether, upon the facts disclosed by the evidence, there was a settlement within the time stated. The inventory filed by the plaintiff shows the total amount of personal estate in his hands to have been $59,-132.11. Of this, $40,000 was in railroad bonds. These bonds were disposed of by the administrator in the year 1872, as follows: Set apart to Margaret E. Van Winkle and Anna Maria Van Winkle, under the second clause of the will, $5,000 each; delivered to Godwin Van Winkle, trustee for Mary V. Blackford, $8,666.67; delivered to W. W. Van Winkle for the heirs of Rathbone Van Winkle, $8,666.67; delivered to Godwin Van Winkle $8,666.67; delivered to Sarah Van Winkle, $1,000, to Sarah E. Van Winkle $1,000, and to W. W. Van Winkle, $2,000. · It was ascertained that it would require $7,106.99 to pay the J. G. Blackford legacy of $1,000, the amount due the city of Parkersburg on account of the sinking fund, taxes for the years 1872-3, due and to become due, estimated expenses and for contingencies amounting to $175, and commissions on receipts, estimated at $2,396.93. This, added to the $40,000 of bonds, makes $47,-196.49. The administrator shows that, up to May 13, 1873, in addition to the bonds, he had collected from various sources, $5,-573.94. The balance of the estate in his hands at that time consisted of solvent claims amounting to $4,859.20, and actual and

supposed insolvent claims amounting to $8,698.97. According
to this showing, the ascertained and approximated liabilities of
the administrator and what he paid out in said first year were
in excess of what he had collected at that time, although he
then held $4,859.20 worth of good assets and $1,500 of shares of
the Little Kanawha Navigation Co., which he says were sup-
posed at that time to have no market value.    The administrator
shows that the deficit was partially covered by withholding pay-
ment of interest, amounting to $1,776.75, received on account of
railroad bonds and other securities, until January, 1873, thus
carrying these amounts as credits of the estate for that year and
reducing the deficit to $481.04.    His general statement for the
first year shows disbursements, $45,616.26, commissions, $2,-
315.77, debts, taxes, etc., to be paid as stated, $7,106.99, total,
$55,039.02.    Against this he places receipts, $47,813.33, actual
and supposed solvent assets, specified, $4,859.20, total, $52,-
672.53.    This shows a deficiency of assets, May 13, 1873, of $2,-
366.49.    Now, it is claimed by the defendants that the adminis-
trator should have charged himself with about $3,000 on account
of the twenty-five shares of stock of the First National Bank of
Parkersburg, and also with the value of certain bonds of the
Little Kanawha Navigation Co. of the par value of $1,700.
These are the only items which are claimed to be assets in ex-
cess of what is included in the inventory, and they are matters
of contention in this suit.    This record fails to disclose that
any such contest existed at the time of the alleged settlement
within the period of eighteen months.    It is to be observed
also that the $7,106.99 of indebtedness, taxes and administra-
tion charges, found in the statement, do not include a note of
$4,000 made by J. G. Blackofrd and endorsed by P. G .Van
Winkle, bearing date May 2, 1870, and for which the estate
was liable, and for which it is claimed the First National Bank
stock and the Little Kanawha Navigation Company bonds were
held by P. G. Van Winkle as collateral.    As J. G. Blackford, to
whose estate these matters properly belong, was at that time
living, doing business and supposedly solvent, he not having
failed until 1876, it is not at all likely that the estate was sup-
posed, during the first year of the administration, to have been
affected, one way or another, by this liability or the collateral,
nor that either the administrator or the distributees of the

estate paid any attention to them or took them into account in any settlement or statement that may have been made. Hence, if it be true, as claimed by the plaintiff, that in June, 1872, he ascertained the amount of the assets and classified them as hereinbefore set out and had frequent interviews with Mary V. Blackford, Sarah Van Winkle, as guardian for the children of Rathbone Van Winkle, and Godwin Van Winkle, personally and as trustee for Mary V. Blackford, thus representing all parties interested as residuary legatees, preliminary to the distribution of the $40,000 of bonds, pointing out the fact that, by doing so, he would reduce the available assets in his hands to an amount insufficient to pay the debts, taxes and administration charges, and afterwards made the distribution as shown by his vouchers, taken from Godwin Van Winkle, Sarah Van Winkle, Sarah E. Van Winkle and Godwin Van Winkle, trustee, bearing dates in May and September, 1872, and in July, 1872, set apart to Anna Maria and Margaret E. Van Winkle, their trust funds of $5,000 each, and for Sarah Van Winkle, guardian for Rathbone Van Winkle's children, $8,-666.67, and in September took out his own legacy of $2,000, it would seem that, in that year, he made to all the parties a full disclosure of the condition of the estate in his hands as it then stood. His uncontradicted testimony is that he had frequent interviews with Mary V. Blackford and kept her informed of the condition of affairs, exhibiting to her slip statements of the results, not only in that year, but every time she asked it for the next two years and up until the fall of 1882. In August, 1873, he gave her and the other interested parties or their representatives a written statement of the distribution. He says that in October of that year, he gave another statement covering the rents and profits of the real estate. Objection is made to the testifying to transactions between himself and Godwin Van Winkle, who is dead but, it having been shown that in June, 1872, he wrote Godwin Van Winkle a letter relating to the condition of the estate and that unsuccessful efforts had been made to obtain the original, he was properly permitted to file a copy prepared from the copy retained by him in his copying book, which shows an approximation of debts and assets exclusive of investments with which he proposed to pay them. It also mentions an advancement in bonds to Godwin Van Winkle

prior to that time and speaks of the necessity of making the dates of the distribution to the other parties correspond with the date of his. The voucher signed by Godwin Van Winkle for $6,000 bears date May 20, 1872. In the record, as exhibits, are copies of statements of the account of the administrator with Mary V. Blackford, bearing date August 27, 1873. All these appellants are the children of Rathbone Van Winkle. At the time of this alleged settlement the plaintiff here was the administrator of the estate of Rathbone Van Winkle and Sarah Van Winkle was the guardian of these children. The plaintiff testifies that he fully informed Sarah Van Winkle, their guardian, of the condition of the estate and gave her verbally the result of his approximation of the condition of the estate, and afterwards, within the eighteen months from the date of his appointment, gave her a written statement of the distribution. The statute does not require any particular form of statement nor is it, in terms, required to be in writing. The record contains no copy of the statement rendered Sarah Van Winkle, guardian, but the testimony is that it was similar to the statement rendered Mary V. Blackford. One of these is a mere statement of the distribution of bonds and the other is an individual account of Mrs. Blackford with the administrator, relating to her share of rents and her interest on bonds, disbursements on account of taxes, improvements on her real estate and moneys paid to her. Neither of them can be regarded as fully showing his receipts as administrator for the year. But, as no particular form of method of statement is required, and as it appears that a verbal statement was made, in which a fuller and more formal statement would no doubt have been given if asked, it would seem to be sufficient. Whether the statute contemplates actual payment within six months from the end of the year in requiring actual settlement for the money received therein or not, it is certain that payment will include actual settlement. From what has been stated, it is manifest that the administrator, within the year, actually paid all that Godwin Van Winkle and Mary V. Blackford were entitled to receive on account of the assets which came into his hands during the first year of his administration. The view that there was a statement and settlement is much strengthened by the fact that, in the year 1872, the bulk of the estate was distributed and

that there is nothing in this record to indicate that, for a period of ten years thereafter, there was any dissatisfaction with the conduct of the administrator or any complaint against him. No steps were taken to bring him to a final settlement until in April, 1883. It is hardly probable that the parties interested in a large estate, such as this, would have remained so long a time without information as to its condition. This is regarded as an important circumstance, tending to support the testimony of the administrator to the effect that they were fully informed.

It is objected that the court has allowed too much for commission, for the reason that the bonds of the Central Railroad Company of Iowa, amounting to $7,333.34, set apart and held for the Rathbone Van Winkle estate and loaned to Godwin Van Winkle, were lost by reason of the bankruptcy of Godwin Van Winkle, and the remainder of said railroad bonds, amounting to $1,333.33, held for the Rathbone heirs, depreciated in value and finally became worthless and were lost by reason of the negligence of the administrator. It is claimed that he ought not to be allowed commission on these sums, but, on the contrary, should be charged with the same as lost by his negligence. The $8,666.67 of bonds belonging to the Rathbone Van Winkle estate, were set apart to that estate by the administrator in 1872. In the same year, $7,333.33 of them were loaned by the administrator to Godwin Van Winkle, together with an additional $5,000. Notes were taken for these amounts and secured by a deed of trust upon real estate, executed by Godwin Van Winkle and wife, and dated December 14, 1872. Afterwards, May 15, 1883, Godwin Van Winkle and wife conveyed absolutely the real estate upon which these debts were secured to M. C. Van Winkle, H. C. Van Winkle, Juliette Van Winkle and Harriette G. Van Winkle, the appellants here, in payment and discharge of said debts, the deed reciting that the value of the real estate and the amount of the debt ascertained were nearly equal. There is nothing in this record to show that the property was not worth the amount of the debt. On the contrary, the recitals of this deed show that the debt was fully paid out of the security taken by the administrator when the loan was made. However, commission cannot be allowed on the $8,666.66, face value of the bonds, set apart for the heirs of Rathbone Van Winkle. There was no actual payment of that part of the estate,

so as to make it appear that, as to it, there was a statement and actual settlement. Had the bonds been delivered to the guardian, and accepted by her as so much cash, the administrator would have been entitled to his commission thereon. *Farneyhough's Ex'rs.* v. *Dickinson,* 2 Rob. (Va.) 582; *Hipkins* v. *Benard,* 4 Munf. 83. Merely designating these bonds as belonging to the Rathbone Van Winkle heirs is not enough. W. W. Van Winkle was not entitled to hold them as administrator of Rathbone Van Winkle, who died before the testator. By his death, the bonds went to his children and should have been delivered to their guardian. There having been no actual payment to the guardian, there is nothing from which it can be inferred that, within six months after the end of the year, the administrator gave her a statement and actually settled with her for the money to which her wards were entitled. Commission should not have been allowed on said sum, and the decree in favor of the administrator should be reduced to the extent of $433.33.

The complaint or claim that the estate has been charged with $17.50 each year as commission on interest collected on bonds held from M. E. Van Winkle and paid to her, is absolutely groundless. The whole amount of interest, $350, is credited to the estate each year. Then the estate is charged with $17.50, the commission on it, and with $332.50, the balance as paid to M. E. Van Winkle. So the charges and credit exactly off-set each other, and the transaction leaves the account of the estate just as if it had never been carried into it at all.

The only other alteration in the settlement in favor of the plaintiff is the allowance of $266.10 as commission on the amounts received from real estate during the period of plaintiff's administration of the estate. It is objected that this service was wholly outside of the duties of the administrator and that whatever he may be entitled to for them cannot be included in his administration charges. The principle laid down in *Dunn* v. *Renick,* 33 W. Va. 483, seems to settle this question. The Court did not stop there to decide whether it was the duty of the executors to pay the taxes on the land. It only ascertained that they had paid them in good faith and under the belief that it was their duty to do so and did what the heirs

had neglected to do. The opinion then proceeds as follows: "The payment of these taxes was for the benefit of the estate and those entitled to the residuum, being those whose duty it was to pay them, it is entirely equitable that the executors should be credited for the amount they paid, as against the residuary legatees for whose benefit the payment was made." This record makes it absolutely certain that the collection of rents, payment of taxes and insurance, and the making of repairs on the real estate was with the consent of all the parties interested in this suit. Otherwise, the plaintiff would not have obtained the rents from this property for a period of ten years, amounting to several hundred dollars. It is suggested that he took charge of the real estate, collection of rents, etc., simply because he could do so. But it is hardly likely that he would have sought the privilege of paying out, on account of it, about $2,500 in excess of what he received. The appellants here were represented by a guardian in respect to all these matters, and surely it cannot be pretended that she was ignorant of the fact that the plaintiff was discharging a duty which protected· the estate of her wards along with, and as a part of, his administration of the estate of his decedent. Nor can it be said that she was without power to take the management of the real estate of her wards out of his hands and perform those duties herself. It is also manifest that, had she done so, it would have been at a cost of considerably more than one-third of $266.10. Clearly, it was an arrangement made by all parties interested for convenience and economy in the management of the whole estate, both real and personal, and the equitable principle asserted in *Dunn* v. *Renick* ought to be applied.

In that case, as in this, the executors had a naked power of sale, more extensive than the one given in this case, but still a mere naked power of sale. Here, the power extended to one-third of the real estate, and was to be exercised only upon request of Mrs. Blackford, while in *Dunn* v. *Renick,* it was practically unconditional and extended to the whole of a certain farm. If such power confers the right to pay taxes and take credit for the amount thereof in the settlement of the administration account, the limitations upon the power above noticed cannot effect the principle. But the decision in *Dunn* v. *Renick* is based, not alone upon the power of sale vested in the execu-

tors, but upon their payment of the money for the benefit of the estate, in good faith, under the belief that it was their duty to pay it, and the fact that the payment so made benefitted equally those who, as residuary legatees, took, in equal proportions, the surplus of the proceeds of the land on which the taxes were paid, and also the personal estate. The Van Winkle lands on which the administrator with the will annexed paid taxes and insurance and made slight repairs were devised to the persons who took the bulk of the personal estate as legatees, and the divisions of the real estate and residuum of the personal property among these persons were made in almost, if not exactly, the same proportions. Hence the rule adopted in *Dunn* v. *Renick* is clearly applicable. To the suggestion that this case involves only the settlement of the administration account, while that of *Dunn* v. *Renick* was an ordinary suit in equity to construe Dunn's will and for other purposes, the reply is that so much of the decision as related to the taxes went no further in its effect than to give the executors credit for the amount of the taxes in their settlement. As under that case, the administrator is entitled to credit for the money expended, less the amount of rents received, why should he not have commission on the rents collected? What is the difference between applying the whole amount of rent collected, and allowing commission on the same, and crediting the rents less the commission? None. The question presents two methods of calculation each of which produces the same result.

Having disposed of the objections to the alterations of the settlement made by the decree of the court in favor of the plaintiff, the complaint made by the appellants on account of the failure of the court to charge the plaintiff with certain sums with which it is claimed he is justly and legally chargeable, is now to be disposed of. From what has been said respecting the commissioner's report, the stipulation upon which the cause was submitted and the decree, it will be seen that the record presents a novel question in procedure. No exceptions to the commissioner's report were filed by the appellants. That report shows on its face that the specifications filed by the appellants were not considered by the commissioner. The decree recites that, in the opinion of the court, a re-committal of the report was necessary. By the stipulation filed, the re-committal was

waived, and the cause was, by agreement, submitted to the court upon all the evidence and papers filed for final determination and adjudication, "the findings of the court to have the same effect as upon a report of a commissioner regularly made up and filed in the cause." But, with one exception, the court failed to certify in the decree or otherwise what facts were found. The decree deals with the report of the commissioner as if the cause had been submitted upon that report and the exceptions thereto filed by the plaintiff. The defendants, the appellants here, filed no exception to the report, nor does the decree set forth any exceptions to the findings or rulings of the court. It is a well settled rule in equity that where a decree is based upon a commissioner's report and there is no exception to the report, pointing out, with reasonable certainty, the particular errors complained of, so as to direct the minds of the court to them, the appellate court cannot consider any error in the decree, unless it be such as appears upon the face thereof. *Ward* v. *Ward,* 21 W. Va. 262; *Estill & Eakle* v. *McClintic,* 11 W. Va. 412; *Keck* v. *Allender,* 37 W. Va. 214; *Kester* v. *Lyon,* 40 W. Va. 161; *Kester* v. *Hill,* 46 W. Va. 750. Errors in the report and decree, not apparent on the record, nor made the subject of exceptions to the report, are regarded as waived, or, rather the parts of the report not excepted to are deemed to be admitted to be correct. *Kester* v. *Lyons,* cited. But the court, having acted upon the stipulation, was bound to follow, and adhere to, its terms. By that instrument, the findings of the commissioner were set aside, although the report and the evidence taken by the commissioner were made parts of the record by the same instrument. Hence, this decree, although apparently based upon the commissioner's report and exceptions thereto, must be treated as a decree of the court upon all the pleadings and evidence in the cause, made independently of the findings of the commissioner. It stands, therefore, upon the footing of a decree in a case in which there is no reference, nor any report of a commissioner, and the assignments of error may be considered.

The first allowance complained of is in respect to the bank stock hereinbefore mentioned. It will be remembered that the plaintiff is charged with $3,000, which he claims was the value of that stock in 1876, when he settled for it with the estate,

taking it into his own hands and charging himself with $3,000 as its value. In 1894, the stock was worth $3,875, and, from 1872, dividends had been paid on it amounting to $3,882. The contention is that this stock belonged absolutely to the estate of P. G. Van Winkle, and is still a part of the unadministered assets of that estate, and wrongfully withheld from it by the plaintiff. Wherefore, it is insisted that he should be charged not only with $875 more on account of its value, but also with the dividends. There is no evidence that this stock belonged to P. G. Van Winkle except that, at the time of his death, it stood upon the transfer book of the bank in his name, J. G. Blackford having formally transferred it to him on the 22nd day of November, 1871. W. W. Van Winkle testifies as follows, in reference to the cause of that transfer: "I was present at the transaction between them (P. G. Van Winkle and J. G. Blackford, on or about November 22, 1871,) in the room of P. G. Van Winkle's—residence of J. G. Blackford—where he lived about the date mentioned; it had reference to the endorsement, by P. G. Van Winkle, of the note of four thousand five hundred dollars for the accommodation of J. G. Blackford. J. G. Blackford requested P. G. Van Winkle to make such indorsement for him, but P. G. Van Winkle declined unless J. G. Blackford would give him collateral to secure such endorsement, for the reason stated, that he, P. G. Van Winkle, was already his security; thereupon J. G. Blackford offered twenty-five shares of the stock of the First National Bank as collateral for the endorsement of the four thousand, five hundred dollar note so requested." He then states that the note was executed by Blackford and endorsed by P. G. Van Winkle on the faith of the bank stock as collateral and, on the same day, the stock was transferred as aforesaid, all with the understanding that, upon the maturity of the note, it was to be reduced to $2,500, for which sum only renewals were to be made. The obligation upon which P. G. Van Winkle was already surety for Blackford was a note for $4,000, dated May 2, 1870, payable to W. W. Van Winkle, administrator of the estate of Rathbone Van Winkle, given in part settlement of the value of five hundred and twenty United States bonds, of the face value of $5,000, for which Blackford, at the death of Rathbone Van Winkle, was indebted to him. Their ascertained value at that time was $5,670.25, which was

reduced to $4,000 by a note of $1,000 due from Rathbone Van Winkle to P. G. Van Winkle, with $60 accrued interest, accounts due from Rathbone Van Winkle to Blackford amounting to $256.86 and a check for $353.37. These facts also are testified to by W. W. Van Winkle. His testimony as to these as well as to the facts relating to the execution of the $4,500 note, and the transfer of the stock as collateral therefor, was objected to as being testimony to personal transactions between the witness and deceased persons. W. W. Van Winkle further testifies that P. G. Van Winkle endorsed Blackford's note for $2,500, at sixty days, in part renewal of the $4,500 note, and that, in March, 1872, P. G. Van Winkle being sick and unable to transact business Blackford came to him and requested him to endorse for him a note in part renewal of the $4,500 note, upon the faith of the same bank stock as collateral for his indemnity, and that in that month, upon the agreement with Blackford that he should hold the bank stock for his indemnity, he did endorse Blackford's note for $2,000, at sixty days, with the understanding that he would continue to endorse for him to the amount of $2,500, the par value of the bank stock, in such amounts as Blackford would, from time to time, request. He further says that, at the time of the original pledging of the bank stock to P. G. Van Winkle, the certificates of stock was handed to him, W. W. Van Winkle, he being then a clerk or assistant in the office of P. G. Van Winkle, and that it had ever since remained in his possession. He claims that, in pursuance of the agreement between him and Blackford, he continued to endorse for the latter, and at the time of Blackford's failure in 1876, he was liable as such indorser for three notes, one at ninety days, for $350, dated December 9, 1875, another, at ninety days, for $600, dated February 17, 1876, and another at seventy-five days, for $1,200, dated January 15, 1876, and was compelled to pay, on account of said notes, the sum of $2,150. Copies of these three notes, and of the checks given in payment thereof, are filed as exhibits with W. W. Van Winkle's deposition. He files also copy of account of First National Bank with him as administrator, taken from the pass book, showing that, from 1872, to 1876, he deposited the dividends on the bank stock, amounting to $1,200, in his name as administrator, and paid nearly all of them out by check to J. G. Blackford. Blackford having failed in 1876

and made an assignment for the benefit of his creditors, fixing the lability upon W. W. Van Winkle to pay the notes endorsed by him, he says he agreed about that time with Blackford that he would take the bank stock at $3,000. In pursuance of that agreement, he wrote out a form of transfer of the stock to himself, under date of October 11, 1878, and signed it as administrator of P. G. Van Winkle, and, in pursuance thereof, the stock was transferred to him upon the books of the bank. After 1876, Van Winkle appropriated the dividends on the stock to his own use. J. W. Leese, cashier of Parkersburg National Bank, testifies that on November 22, 1871, a sixty day note for $4,500, made by Blackford and endorsed by P. G. Van Winkle, was discounted, and the money used by Blackford. It fell due January 24, 1872, when Blackford discounted his note at sixty days for $2,500, endorsed by P. G. Van Winkle, and the proceeds were placed to his credit, and paid the $4,500 note by his check. The $2,500 note was paid by Blackford March 25, 1872, on which date there was placed to Blackford's credit, a sixty day note for $2,000, made by Blackford and endorsed by W. W. Van Winkle. On May 25, 1872, the $2,000 note was paid by Blackford and a note for $1,500, made by him and endorsed by W. W. Van Winkle was placed to his credit. On July 27, 1872, the $1,500 note was paid and a note for $1,000, endorsed by W. W. Van Winkle, was credited to Blackford. On October 3, 1872, the $1,000 note was paid by Blackford, and a $600 note, endorsed by W. W. Van Winkle, was placed to Blackford's credit. On December 5, 1872, the $600 note was paid and a ninety day $500 note, made by Blackford and endorsed by W. W. Van Winkle, was placed to the credit of Blackford, and paid by Blackford March 8, 1873. C. A. Bukey, assistant cashier of the same bank, testifies to numerous notes handled by that bank, made by Blackford and endorsed by W. W. Van Winkle in the years 1874-75, all of which were paid by Blackford except the $350 note, dated December 9, 1875, which was paid by Van Winkle in 1876. The other two notes paid by him as endorsed were handled in the Second National Bank of Parkersburg. Mr. Van Winkle testifies that from March 13, to June 13, 1874, his endorsements for Blackford amounted to $6,500, and on the latter date, he endorsed a seventy-four day note for $4,000 for Blackford. The amount charged to the estate of

P. G. Van Winkle on account of the $4,000 note of May 2, 1870, is $3,589.71 with interest thereon from February 23, 1876, to April 2, 1876, amounting to $29.91, making a total of $3,619.62. Against this, Cimmissioner Snodgrass charged the administrator with $3,000, the value of the bank stock, and $198.27 received by the administrator from the assignee of J. G. Black ford, being 32 per cent. dividend on $619.62, the balance due on the $4,000 note after crediting thereon the $3,000, making in all $3,198.27, as a credit upon the amount paid by the Van Winkle estate on account of the $4,000 note, leaving the loss to the estate $421.35.

Independently of the testimony of the plaintiff, there is enough evidence in this record to warrant the finding that the bank stock was held by P. G. Van Winkle, not absolutely, but as collateral. It was transferred to him on the very day on which he endorsed the $4,500 note. P. G. Van Winkle is shown by his books to have been a very careful man and an accurate and systematic bookkeeper, and his books do not disclose any investment by him at any time in the stock of that bank, although they do show all his investments in other stocks and bonds. From the death of P. G. Van Winkle, early in 1872, until the failure of Blackford, early in 1876, a period of four years, during all which time, Blackford was transacting a large business and handling large amounts of money and property, and during which, as indicated by the evidence, nobody suspected that there was any danger of his becoming insolvent; the dividends on the stock were paid to him by W. W. Van Winkle, the administrator, who, having been in the office of Mr. Van Winkle for several years, undoubtedly had same knowledge of his relations to Blackford and the status of that stock. Commissioner Snodgrass, the county court and the circuit court have all found and held that the stock was collateral in the hands of P. G. Van Winkle, and not his property absolutely, and the facts herein stated, as disclosed by the record, independently of the testimony of the plaintiff, concerning any personal transaction between him and P. G. Van Winkle or between him and J. G. Blackford, are sufficient to support that finding There is no evidence against it except that, at the time of the death of P. G. Van Winkle, the stock stood on the books of the bank in his name, which fact is clearly insufficient to overcome

the inference arising from the other facts, with which it is also perfectly consistent. Jones, Pled. & Col. Sccu., sec. 153. Either as collateral in Van Winkle's hands, or as his own property, the stock would properly have stood in his name on the transfer book.

The only circumstance in the record from which, in the absence of anything to the contrary, it might possibly be inferred that that bank stock was pledged for the payment of the four thousand dollar note, as well as the four thousand, five hundred dollar note, is the application of part of the proceeds of that stock to the payment of said four thousand dollar note as hereinbefore shown. This application, however, is referable to a right on the part of the administrator of an entirely different kind. Blackford, the principal in the four thousand dollar note, was insolvent at the time the application was made, and this stock was a chose in action belonging to Blackford's estate, remaining in the hands of the administrator of the estate of Peter G. Van Winkle, the surety in said note. The insolvency of Blackford, the principal, conferred upon the surety the right in equity to withhold and apply this stock to payment of the debt by way of relieving himself as surety. *Mattingly* v. *Sutton,* 19 W. Va. 19. The act being attributable to this right, the inference that the application was made on the ground of the stock having been pledged for the payment of the note, is negatived. In addition to this circumstance, Van Winkle says he applied it as a creditor of Blackford and not as pledgee. He is certainly competent to explain his own act. This raises the question, whether the administrator exercised his right of application to its full extent, and with reasonable care and diligence, to absolve the estate from loss on account of said four thousand dollar note. There was a loss of $421.35, as has been shown. Did the administrator give to the estate the full value of the stock? It seems so. The commissioners, county court and circuit court have fixed the value at $3,000.00. On that valuation it was paying eight and one-third per cent. at the time. Van Winkle says that was the market price, and the statement stands unchallenged. But, any dividends accrued or remaining in his hands when the Blackford failure came were equally applicable in the same right. The last dividend shown to have been paid to Blackford was the May dividend of 1875. Another, amount-

ing to $125.00 was received in November of that year, and the failure seems to have occurred between that date and May, 1876, when the next dividend accrued, for, on March 11, 1876, Van Winkle paid off, with his individual check, one of the notes on which he was endorser for Blackford. As to the exact date of the failure, the testimony is silent. Hence, the best evidence of the time, as related to dividend accruals, is the circumstances of payment of the note above referred to. Van Winkle says the failure occurred and he took and held the stock in his own right in 1876. So it must have been after the receipt of the dividend of November, 1875, and before that of May, 1876. Clearly, therefore, the administrator ought to be charged with the $125.00 dividend of November, 1875, which he did not pay to Blackford nor charge himself with.

In immediate connection with the foregoing, relating to the bank stock, arises the contention that the administrator failed to collect from the assignee of J. G. Blackford the full amount of what belonged to the P. G. Van Winkle estate as its share of the assets of J. G. Blackford, upon the *pro rata* distribution thereof. The amount charged to the administrator, as having been received from the assignee, is $198.27, being a divided on Blackford's liabilities, but it is insisted that the whole amount due upon the note, without deducting the value of the stock, should have been put in against the ·Blackford assets, reserving the stock to pay the balance after applying the amount received in the *pro rata* distribution of the general assets. In the first instance, that was done. W. W. Van Winkle combined the amounts due to himself individually, $2,157.15, less $400, agreed value of the Little Kanawkha Navigation Company bonds, leaving $1,757.15, and to himself as administrator of Rathbone Van Winkle, on account of the $4,000 note, $3,589.71, making a total of $5,346.86, on which he received a 32 per cent dividend from the assets of Blackford, $1,710.98. Afterwards, he and the assignee came to the conclusion that the value of the bank stock should have been deducted and the dividend computed on the balance, $2,346.86, showing an excess of $960 paid by the assignee to Van Winkle on account of the two claims, on which interest had accrued to the amount of $816.40, making a total due from Van Winkle to the assignee of $1,776.40. They also found an additional dividend of $330.53, due on the

two claims which was credited on the excess and interest, leaving a balance of $1,445.87, which was paid by Van Winkle to the assignee. By the general rule in equity, the pledgee may prove his whole claim against the pledgor's estate in insolvency without deducting the value of his security. Jones, Pled. & Col Secu., section 587; *Bank* v. *U. S.,* 92 U. S. 618; *Merrill* v. *Bank,* 173 U. S. 131; *Mason* v. *Bogg,* 2 Mylne & Craig 443. But this principle is not applicable here. The security had been converted into money or, at least, 'ts value had been ascertained and applied in satisfaction *pro tanto* of the debt, and the creditor could prove only the balance due against the assets of the insolvent debtor. Jones, Pled. & Col. Secu., section 587; *Midgeley* v. *Slocomb,* 32 How. Pr. (N. Y.) 423.

As to the bonds of the Little Kanawha Navigation Company, which, by some means, came into the hands of the plaintiff from J. G. Blackford, there is not a particle of evidence that they ever belonged to the estate of P. G. Van Winkle, or that they were held as collateral by him or for the $4,000 note upon which he was surety for Blackford. It only appears that they were in the hands of the plaintiff and that he credited $400.00 as their agreed value upon the amount due him by reason of his having paid the three notes of Blackford upon which he was endorser. That is, in no sense, an admision that they were in any way applicable to the payment of the $4.000 note, and there is no evidence that they were so applicable. Hence, the court properly disallowed the claim of the appellants made in reference to them.

Only one other item remains to be considered. On the 18th day of October, 1888, a decree was made by the circuit court of Wood county, in a suit brought to sell real estate of the Rathbone Van Winkle heirs, reciting that certain real estate, belonging to the estate of P. G. Van Winkle, in which said heirs were interested, had been sold for the sum of $1,650.00, out of which W. W. Van Winkle has received, as special commissioner, the sum of $220.00 as the share of said heirs, and that the estate of P. G. Van Winkle, of which he was administrator, having also sole charge of the real estate, was indebted to him in the sum of $982.30, for money necessarily paid out for taxes, repairs to buildings and insurance, in excess of the receipts from rents, of which $327.43 was charged to said heirs, and ordering that

he retain said sum of $220.00 and apply it as a credit upon said sum of $327.43. The refusal of the court to charge W. W. Van Winkle with this sum is assigned as error. All that can be said of this decree is, that it gave the plaintiff the right to retain the $220.00 and apply it as a credit as therein stated. It does not show that he did so, nor is there anything in this record which shows it. He swears that the money was not retained by him but was paid out and expended in this suit and in the improvement of the estate of these appellants. Whether he did retain the money which he was so authorized to retain, is the vital question. The real estate account and settlement, made by Commisioner Snodgrass and approved by the court, shows neither a charge nor a credit relating to the transactions under the decree of October 18, 1888. If it were shown that the plaintiff retained out of the $372.00, this $220.00, he ought to be charged with it here, otherwise he ought not to be so charged. He says he did not so retain it but paid out the whole amount for the benefit of said heirs, and his testimony is uncontradicted. There being no dispute about the indebtedness to the plaintiff on account of his services and expenditures in caring for the real estate, the burden is upon the appellants to show payment, and they have clearly failed to show that said sum of $220.00 was actually applied on that indebtedness. They have only shown that his right to do so was adjudicated . Had the parties who were entitled to the fund been adults, that right would have existed without adjudication, and the adjudication was no doubt asked for the sole reason that they were infants and the fund belonged to the corpus of their estate, and could only be expended upon an order of the court.

Two errors have been noted, either of which is sufficient to reverse the decree. A more serious one, however, remains to be indicated. Taking the report of Commissioner Snodgrass which disallowed to the administrator his claim for commission for the first year, amounting to $2,315.77, as the basis of its action, the circuit court gave credit for said sum on the amount found due by said commissioner from the administrator to the estate, $4,118.86. This sum included, $1,189.62, charged against the administrator as interest. Had the court gone back and credited said commissions in the first year of the account in the statement, there would have been no balance of $2,197.17 against

the administrator for that year, on which to charge interest. And if, after giving credit there for the commission, the court had re-stated the whole account for subsequent years, it is not likely that the close of it would have contained any interest charged against the administrator of any consequence. We now find and hold that, instead of allowing $2,315.77 as commission, the circuit court should have given credit for $1,882,44, and this sum should be credited in the acount for the first year of the administration, and the whole account reformed and re-stated. This commission was earned in the first year and should be credited as of that year. All the forms of statements in the settlements of administration accounts, found in the books, show credits for commissions in the years in which they were earned. 4 Min. Ins. 1500. The hardship and injustice of postponing such credits until final settlement is too apparent to require an argument to show it. As the item of $125.00 became chargeable to the administrator apparently before May, 1876, it should be entered in the account for the year ending May 13, 1876. The item of $850.00 paid on account of the debt due to the sinking fund of the city of Parkersburg should be entered as of July 18, 1881.

As the case is to be remanded for re-statement of the account, the principles governing the allowance of interest in such accounts will be set out, and, in connection therewith, an additional assignment of error will be disposed of. When the personal representative is not in default, although there is a balance against him in favor of the estate, the interest on the balance is not carried into the account, but stands over until final settlement, or until sufficient disbursements have been made to discharge it, after the balance of principal against him has been extinguished. 3 Min. Ins. 641. This is the method followed by Commisioner Snodgrass in his report. In re-stating the account, a different rule is to be applied. The administrator should have separated from his general account the acounts of payments to legatees and distributees, long before he made his settlement, as it does not appear that the existence of any debts prevented his doing so. Therefore, he ought to settle under the rule of debtor and creditor, charging interest on money due, and applying payments to the liquidation of the interest first, and then of the principal.

*Garrett* v. *Carr,* 3 Leigh 416; *Handley* v. *Snodgrass,* 9 Leigh 484; 3 Min. Ins. 642. If a balance shall appear at any time in favor of the administrator, the same rule is to be applied. 3 Min. Ins. 641. Nothing appears in the case, calling for the application of the rule of compound interest against the administrator. He is so charged when he uses the money of the estate in trade and will not disclose the profits he has made, or where the fund is directed to be laid out to accumulate, or where he has acted as *quasi guardian,* as well as executor. 3 Min. Ins. 640, 642. The plaintiff has not used the funds of the estate in trade. By the second and third clauses of the will, two separate funds of five thousand dollars each were directed to be invested "in some safe public bonds or securities, bearing at least six per centum annual interest," or deposited in some trust company, reported to be solvent, the interest on which was to be paid to the testator's two sisters during their natural lives, and after their deaths the principal sums were to fall into, and constitute a part of, the residuum of the estate. This direction of the will was not strictly observed, and it is urged, for this reason, not only that compound interest should be charged against the administrator, but that he should be compelled to account also for alleged resultant losses. By way of compliance, ten thousand dollars in railroad bonds were set apart and held for the purposes aforesaid. · Soon afterwards, one set of these bonds, part of which constituted one of the five thousand dollar funds, greatly depreciated in value, something like fifty-two per cent, as a result of the panic of 1873. These were bonds in which the administrator found his testator's funds already invested. He could not foresee the panic of the following year. He might well have assumed that the testator himself considered them a safe investment. A short time before his death, some time in the fall of 1871, he exchanged United States bonds for these railroad bonds, twenty thousand dollars of Cincinnati, Baltimore and Ohio Railroad bonds, and twenty thousand dollars of Central Railroad of Iowa bonds. These bonds constituted by far the larger part of the solvent personal estate. There was but little cash. To have followed strictly the directions of the will, it would have been necessary to convert ten thousand dollars of the bonds or other assets into cash and change the investment. Whether that could have been done

before the Central Railroad of Iowa bonds depreciated, is not shown. It may have been practicable and it may not have been. The sequel shows they were not as good as the Cincinnati, Baltimore and Ohio bonds, but there is nothing here to indicate that there was not ground, at the time they were set apart, for considering them equally as good. Considering them good, W. W. Van Winkle took his own legacy of two thousand dollars in them. It is not the case of a requirement to invest actual cash, for the testator did not leave as much as five thousand dollars in cash, nor could his debts have been paid and these two funds invested as directed by the will without converting some of the bonds or other property into cash. Not only was it necessary to do this, in order to comply with the direction found in the will, but an investment in safe public bonds or securities bearing at least six per cent. interest must have been found. It may be that such opportunities were at hand, but there is nothing in this record to show it, or that the railroad bonds could have been readily converted. An executor or administrator is not to be charged with losses, nor with compound interest, unless guilty of negligence or misconduct. *Hooper* v. *Hooper,* 32 W. Va. 541; *Holt* v. *Holt,* 46 W. Va. 397. *Prima facie,* he is chargeable with all the assets undoubtedly, and must account for them, but if he account by showing a loss, which he could not have prevented by the exercise of due diligence and vigilance, he thereby discharges himself as to the assets lost. 3 Min. Ins. 634; *Evans* v. *Shroyer,* 22 W. Va. 581; *Ritz* v. *Bennett,* 6 W. Va. 417; *Cavendish* v. *Flemming,* 3 Munf. 198. Some of the authorities say he is not to be charged with a debt not collected unless it is shown that it has been lost by his negligence. Under the circumstances shown by this record, it cannot be said or held that the loss on account of the bonds is due to the negligence of the administrator. The statement of the account shows that the bonds of the Central Railroad of Iowa were charged off early in 1874 as being in default of interest and of no salable value. How could the administrator have foreseen this? It was a result of a great financial panic which suddenly swept over the whole country, spreading financial havoc and ruin on every hand. Who can say that he could have converted them into safe bonds or into cash within the short time allowed him, without sacrifice? It is not to be assumed that this could have

been done. The occasion of the loss was a great public calamity. By extreme wariness and caution, its effect might have been avoided, not because the disaster was foreseen or anticipated, for that was impossible, but merely by extreme caution, which the law does not require. As to compound interest, an executor acting as a *de facto* guardian, under a will requiring him to invest a fund for accumulation, or to pay interest to some designated person, is chargeable with compound interest when he fails to so invest it and uses the money himself. Is there any rule under which he is to be so charged for mere failure to invest in the particular class of securities, or in the mode, indicated by the testator? No such rule has been produced or found. In case of negligent loss of the fund he probably would be, but such question does not arise here.

In the brief of counsel for appellant, there are some references to alleged errors in the report of Commissioner Clemens. That is not the report upon which the decree complained of is based. Nor are the supposed errors referred to attributable to the cause assigned. In one the estate is credited with $265.65 as interest received, and then charged with $243.82, as interest paid out. The difference is the commission and not interest. The same is true of the other item complained of, $296.69, interest received, and $281.06, interest disbursed, the difference being practically the amount of commission. Evidently, there is an error in the calculation. The disbursement was clearly intended to be the amount received less the commission.

Another apparently groundless complaint in the brief filed for appellant, M. C. Van Winkle, says compound interest is allowed in the real estate account, because it is made up with annual rests. A hasty examination of it reveals no charge of interest upon interest, though made with annual rests. Against each charge of interest, on an annual balance, credits of rents received, largely exceeding the interest, appear to have been entered, and the interest charges thus extinguished under the partial payment rule. But if there is any compound interest in the account, it should be expunged.

It is urged in the brief that this Court enter a decree finally settling this case, but counsel for appellant asks the Court to go back into the account and apply the two sums, in respect to which there is error in the decree, so as to show the final result.

This work properly belongs to a commissioner, and counsel, by agreement. cannot impose it upon the Court. It is manifest that no proper decree can be entered without a re-statement of the account upon the principles herein stated. For this purpose, the cause must be remanded, and, in re-stating the account, the report of Commissioner Snodgrass is to be taken as the basis and altered according to the findings and directions herein given.

For these reason, the decree is reversed and the cause remanded to the circuit court of Wood county to be further proceeded in according to the principles here stated, and further according to the rules and principles governing courts of equity.

*Reversed.*